IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **Case No.: 5:23-cr-00437** |
| Plaintiff, | |
| -vs- | **JUDGE PAMELA A. BARKER** |
| **CHARLES HENRY MILTON, III,** | |
| Defendant. | **MEMORANDUM OPINION & ORDER** |

Before the Court is Defendant Charles Henry Milton, III's ("Milton") Motion to Suppress filed on May 18, 2024. (Doc. No. 19.) On May 28, 2024, the United States of America ("the Government") filed a Response in Opposition. (Doc. No. 20.) And, on June 3, 2024, Milton filed a Reply in support of his Motion. (Doc. No. 21.)

For the following reasons, the Court DENIES Milton's Motion to Suppress.

**I.    Procedural History**

On August 9, 2023, a grand jury charged Milton with possession with intent to distribute a substance containing cocaine, fentanyl, and methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) (Count 1); felon in possession of firearms and ammunition in violation of 18 U.S.C. § 922(g)(1) (Count 2); and possession of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 3). (Doc. No. 1.)

The charges stem from law enforcement's May 19, 2023, search of two residences—1817 Penn Place NE, Canton, Ohio ("Penn Place") and 2711 Maple Avenue NE, Canton, Ohio ("Maple Avenue")—where they found and seized drugs and firearms. (Doc. No. 20-1.) On May 18, 2024, Milton moved to suppress the seized evidence, arguing that the information in the search warrant

affidavit that connected Milton's drug activity to the two residences was stale. (Doc. No. 19, PageID# 75.) On May 28, 2024, the Government filed an Opposition to Milton's Motion. (Doc. No. 20.) And, on June 3, 2024, Milton filed a Reply in support of his Motion. (Doc. No. 21.)

On June 20, 2024, at Milton's request, the Court held an evidentiary hearing. Previously, on June 3, 2024, the Court had granted Milton's Motion to subpoena the officer that authored the search warrant affidavit, Task Force Officer ("TFO") Corey A. Thompson, for the hearing. (Doc. Nos. 22, 23.) At the beginning of the hearing, however, Milton's defense counsel agreed that the Court is limited "to the four corners of the [search warrant] affidavit" when evaluating Milton's Motion to Suppress. *See United States v. Waide*, 60 F.4th 327, 337 (6th Cir. 2022). Accordingly, TFO Thompson only testified to the authenticity of the search warrant and affidavit.

## II. The Search Warrant Affidavit

In the search warrant affidavit, TFO Thompson[1] avers the following information.

In March 2023, TFO Thompson debriefed with a confidential source ("CS") about drug traffickers operating in Stark County. (Doc. No. 20-1, PageID# 94.) During the debrief, the CS stated that he purchased cocaine from an individual he knew as "Charlie Hustle." (*Id*.) The CS gave TFO Thompson the cell phone number for "Charlie Hustle," and the CS stated that he has met "Charlie Hustle" at Penn Place and Maple Avenue "several times" to purchase cocaine. (*Id*.) TFO Thompson showed the CS a photograph of Milton, and the CS positively identified Milton as the person he knows as "Charlie Hustle." (*Id*.) TFO Thompson also discovered that Milton is on federal probation with a listed address of 1628 28th Street NE in Canton, Ohio. (*Id*. at PageID# 94-95.)

---

[1] TFO Thompson has worked for the Summit County Sheriff's Office for sixteen years. (Doc. No. 20-1, PageID# 94.) On April 13, 2022, he became a deputized TFO with the Drug Enforcement Agency. (*Id*.)

Investigators conducted a total of three controlled buys of cocaine from Milton at Penn Place and Maple Avenue. (*Id*. at PageID# 95.) Each of these controlled buys was audio- and video-recorded.[2] (*Id*.)

The first controlled buy was at Maple Avenue on March 13, 2023. (*Id*.) Investigators gave the CS $1,400 to purchase cocaine from Milton. (*Id*.) The CS called Milton and arranged to meet him at Maple Avenue. (*Id*.) Shortly thereafter, investigators began stationary and mobile surveillance around Maple Avenue. (*Id*.)

Investigators observed Milton arrive at Maple Avenue driving a silver Mazda SUV. (*Id*.) They ran the SUV's license plate and found that it was registered to Milton's mother. (*Id*.) Investigators then observed the CS arrive, leave his vehicle, and enter the back door of the Maple Avenue residence. (*Id*.) Then, the CS exited the residence, returned to his vehicle, and departed. (*Id*.) After the controlled buy, the CS gave TFO Thompson a clear plastic bag containing a powdery substance. (*Id*. at PageID# 96.) The CS explained that he met Milton in the kitchen of the residence, gave Milton the money, and Milton handed him the bag of suspected cocaine. (*Id*.)

The second controlled buy was also at Maple Avenue and occurred on March 30, 2023. (*Id*.) As before, the CS contacted Milton to purchase cocaine and arranged to meet Milton at Maple Avenue. (*Id*.) After the CS made the phone call, investigators began surveillance around Maple Avenue. (*Id*.) Before the CS arrived, they observed the same silver Mazda SUV that Milton was driving during the last controlled buy parked at Maple Avenue. (*Id*.) When the CS arrived, he got out of his vehicle and entered the back door of the residence. (*Id*.) Next, the CS exited the residence,

---

[2] These controlled buys are not the basis for any of Milton's charges. TFO Thompson confirmed at the hearing that his office did not turn over to the Government the recordings of the controlled buys.

entered his vehicle, and left. (*Id*.) TFO Thompson debriefed the CS after the controlled buy. (*Id*.) The CS explained that, like the last controlled buy, he met Milton in the kitchen, gave Milton the money, and Milton gave him the suspected cocaine. (*Id*.)

On May 3, 2023, investigators were conducting surveillance around Penn Place. (*Id*. at PageID# 97.) They saw the silver Mazda SUV that Milton was driving during the last two controlled buys parked in the Penn Place residence's driveway. (*Id*.) On May 10, 2023, investigators saw Milton's silver Mazda SUV parked at a church directly across from Penn Place. (*Id*.)

The third controlled buy was on May 11, 2023, at Penn Place. (*Id*.) Investigators gave the CS $1,000 to purchase cocaine from Milton. (*Id*.) The CS contacted Milton and arranged to meet at Penn Place. (*Id*.) Before the CS arrived at Penn Place, investigators observed that Milton's silver Mazda SUV was parked in the driveway. (*Id*.) When the CS arrived at Penn Place, he walked to the front door and entered the residence. (*Id*.) During the debrief after the transaction, the CS stated that Milton came down from the second floor to meet him. (*Id*. PageID# 98.) The CS also stated that he did not see anyone else inside the house. (*Id*.) After the CS left Penn Place, investigators observed Milton standing next to his silver Mazda SUV holding up his cell phone as if on a phone call. (*Id*.)

Based on the three controlled buys, TFO Thompson averred that "Milton is utilizing both residences [Maple Avenue and Penn Place] for his narcotics trafficking operation." (*Id*.)

### III. Law and Analysis

#### A. Probable Cause Standard

The Fourth Amendment provides that "no [w]arrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "[P]robable cause exists when an affidavit shows a

4

'fair probability' that criminal evidence will be found in the place to be searched." *United States v. Moore*, 999 F.3d 993, 996 (6th Cir. 2021).

Stale information cannot support probable cause. *United States v. Spikes*, 158 F.3d 913, 923 (6th Cir. 1998). "But information is not stale merely because some time has passed since the relevant events occurred." *United States v. Pointer*, 2022 U.S. App. LEXIS 35506 at *19 (6th Cir. Dec. 20, 2022). Rather, courts look to the following factors to determine whether the information is too stale to support probable cause:

> (1) the character of the crime (chance encounter in the night or regenerating conspiracy?) (2) the criminal (nomadic or entrenched?) (3) the thing to be seized (perishable and easily transferrable or of enduring utility to its holder?) (4) the place to be searched (mere criminal forum of convenience or secure operational base?).

*Id*. (quoting *United States v. Abboud*, 438 F.3d 554, 572-73 (6th Cir. 2006)). In the drug trafficking context, "staleness concerns are lessened where there is 'information indicating an ongoing and continuing narcotic operation.'" *Id*. (quoting *United States v. Frechette*, 583 F.3d 374, 378 (6th Cir. 2009)).

In applying the above probable cause standard, "the [issuing] magistrate uses a practical standard, based on factual and practical considerations of every day life, rather than a technical standard." *United States v. Sneed*, 385 F. App'x 551, 556 (6th Cir. 2010) (citing *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010)). Courts should "accord the magistrate's determination" of probable cause "'great deference.'" *United States v. Kinison*, 710 F.3d 678, 682 (6th Cir. 2013) (quoting *United States v. Terry*, 522 F.3d 645, 647 (6th Cir. 2008)). The question is "whether the magistrate had a substantial basis for his conclusion" that probable cause existed. *United States v. Christian*, 925 F.3d 305, 310 (6th Cir. 2019).

### B. Penn Place

Milton argues that the single controlled buy at Penn Place— which occurred six days before TFO Thompson signed the affidavit—was stale and "insufficient to form probable cause justifying the execution of the search warrant" on May 19, 2023. (Doc. No. 19, PageID# 80.)

For the following reasons, the Court concludes that the probable cause in the affidavit to search Penn Place was not stale.

As an initial matter, the May 11, 2023, controlled buy at Penn Place was "not particularly remote." *Pointer*, 2022 U.S. App. LEXIS 35506 at *20. It occurred a little more than a week before the search. *See id*. (finding controlled buys that occurred "less than a year" to "two months" before a search warrant was executed not stale). Additionally, two months earlier, the CS had reported Penn Place as a location where he would meet Milton to buy cocaine. Law enforcement confirmed this information when they observed Milton's SUV parked at or near Penn Place on May 3 and 10, 2023. They further confirmed this information by conducting the controlled buy at Penn Place on May 11, 2023. And during that controlled buy, Milton was at Penn Place before the CS arrived and came down from the second floor to meet the CS. Together, these facts suggest that Penn Place was more than a "mere criminal forum of convenience" for Milton and closer to a "secure operational base." *See United States v. Sinclair*, 631 F. App'x 344, 348 (6th Cir. 2015) (finding a location "closer to a 'secure operational base'" where law enforcement observed the defendant at the location four times and observed him using a key to gain entry). Thus, the more recent controlled buy and observations of Milton at Penn Place refreshed the CS's earlier report that Milton used Penn Place to sell drugs. *See United States v. Thomas*, 605 F.3d 300, 310 (6th Cir. 2010) ("[I]nformation from an informant that is otherwise stale may be 'refreshed' if the affidavit contains 'recent information [that] corroborates otherwise stale information'.").

Taken together, the CS's report that he bought drugs at Penn Place in the past, the observation of Milton at Penn Place in the days preceding the third controlled buy, and the third controlled buy itself all suggest that Milton was using Penn Place as a "secure operational base" for his ongoing drug trafficking operation. *United States v. Hython*, 443 F.3d 480, 485 (6th Cir. 2006). Accordingly, the issuing judge had a substantial basis to conclude that probable cause existed to search Penn Place. *See Sinclair*, 613 F. App'x at 348 (finding a fifteen-day span between the last observation of the defendant at the searched address and the issuance of the affidavit insufficient to defeat probable cause).

C. **Maple Avenue**

It is a closer question, however, whether the information in the affidavit about Maple Avenue was stale. Milton argues that the two controlled buys at Maple Avenue "would certainly not support probable cause" to search for drugs there because they "occurred several months prior" to the search. (Doc. No. 19.)

The Government responds that the two controlled buys at Maple Avenue "show a continuous and ongoing drug trafficking" operation with Maple Avenue as Milton's base. (Doc. No. 20, PageID# 90.)

The Sixth Circuit has explained that "the sale of drugs out of a residence . . . is not inherently ongoing." *Hython*, 443 F.3d at 485. Rather,

> it exists upon a continuum ranging from an individual who effectuates the occasional sale from his or her personal holdings of drugs to known acquaintances, to an organized group operating an established and notorious drug den. The inclusion of outdated information has been insufficient to render an entire affidavit stale when the affidavit as a whole establishes that the criminal activity in question is ongoing and continuous, or closer to the "drug den" end of the continuum.

*Id*.

7

Here, the two controlled buys in March 2023 at Maple Avenue together with the third controlled buy in May 2023 at Penn Place establish that Milton's drug activity was, as a whole, ongoing. However, nearly sixty days separate the last controlled buy at Maple Avenue from the date of the affidavit. "In the context of drug crimes, information goes stale very quickly 'because drugs are usually sold and consumed in a prompt fashion.'" *United States v. Brooks*, 594 F.3d 488, 493 (6th Cir. 2010) (quoting *United States v. Frechette*, 583 F.3d 374, 378 (6th Cir. 2009)). Therefore, courts generally require more recent information that "refreshe[s]" the information "that is otherwise stale." *United States v. Thomas*, 605 F.3d 300, 310 (6th Cir. 2010) (finding that electrical bills leading up to the search warrant "refresh[ed]" an informant's eight-month-old tip that the defendant was growing marijuana); *see also Pointer*, 2022 U.S. App. LEXIS 35506 at *21 (finding that even if the controlled buys were remote, other more recent information corroborated that the defendant was using the searched location as a "secure operational base"). In the affidavit here, there is no more recent information about Maple Avenue to "refresh" the two earlier controlled buys. *Cf. Hython*, 443 F.3d at 486 ("The single transaction is not supported by any further police investigation—the affidavit includes no observation of deliveries to the address, no monitoring of the frequency or volume of visitors to the house, no second controlled buy, no further surveillance whatsoever.").

Even so, the Court need not decide whether more recent information is necessary because, as it explains in the next section, the good-faith exception to suppression applies. *United States v. McCraven*, 401 F.3d 693, 698 (6th Cir. 2005) ("In sum, we think the sufficiency of the present affidavit is a close question. We need not resolve the question, however, because, as we conclude, the denial of the motion to suppress was proper under the good-faith rule.").

8

### D. The Good-Faith Exception

The good-faith exception applies when law enforcement "conduct a search in 'objectively reasonable reliance' on a warrant later held invalid." *Davis v. United States*, 564 U.S. 229, 238-39 (2011) (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)). The question is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's decision." *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017).

A well-trained officer would have known that the search was illegal in the following four instances:

> [1] [I]f the magistrate . . . was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth . . . [2] where the issuing magistrate wholly abandoned [her] judicial role . . . [3] [where] a warrant [is] based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable . . . [and [4] where] a warrant [is] so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

*United States v. Moorehead*, 912 F.3d 963, 968 (6th Cir. 2019) (quoting *Leon*, 478 U.S. at 923).

"The good-faith standard is 'less demanding' than the 'threshold required to prove the existence of probable cause.'" *United States v. Powell*, 603 F. App'x 475, 477 (6th Cir. 2015) (quoting *United States v. Carpenter*, 360 F.3d 591, 595 (6th Cir. 2004)). All it requires is that the affidavit establish "*some* connection, regardless of how remote it may have been, between the criminal activity at issue and the place to be searched." *United States v. Laughton*, 409 F.3d 744, 750 (6th Cir. 2005).

Milton argues that the good-faith exception does not apply to the search of Maple Avenue because it was "unreasonable to assume that drugs were still located [there] . . . many days and months after the alleged controlled buys." (Doc. No. 19, PageID# 80.) In other words, he contends that the

affidavit fails under *Leon's* third exception because it so lacked in indicia of probable cause that it was unreasonable for law enforcement to believe that probable cause existed.

The Court disagrees. The affidavit established "*some* connection" between Maple Avenue and Milton's drug dealing for law enforcement to reasonably believe that Maple Avenue contained evidence of drug offenses. *Laughton*, 409 F.3d at 750. First, in early March 2023, the CS informed investigators that he had bought cocaine from Milton at Maple Avenue in the past. Second, investigators confirmed this information by having the CS conduct not one, but two controlled buys with Milton at Maple Avenue, first on March 13, 2023, and second on March 30, 2023. During both controlled buys, Milton was already at Maple Avenue before the CS arrived, and he met the CS in the residence's kitchen to conduct the drug transactions. From these facts, it was reasonable for law enforcement to believe that Milton was using Maple Avenue "to store drugs and otherwise further [his] drug trafficking." *United States v. Williams*, 544 F.3d 683, 687 (6th Cir. 2008). Lastly, the third controlled buy in May 2023 at Penn Place at least confirmed that Milton was still involved in an ongoing drug trafficking operation. And since there was less than two months between the last controlled buy at Maple Avenue and the search warrant affidavit, it was reasonable for law enforcement to believe that Milton was still using Maple Avenue for his drug trafficking operation. In other words, the lapse in time was not so great that it "vitiate[d] the minimally sufficient connection" that law enforcement already established between Milton's drug dealing and Maple Avenue. *See United States v. Powell*, 603 F. App'x 475, 478 (6th Cir. 2015) (finding that "the affidavit was not sufficiently stale to vitiate the minimally sufficient nexus" where there was an eight-month time lag between when law enforcement last observed drug activity at the residence and when they searched the residence). All told, law enforcement's reliance on the affidavit to search Maple Avenue was objectively reasonable.

**IV.** **Conclusion**

For the foregoing reasons, the Court denies Milton's Motion to Suppress. (Doc. No. 19.)

**IT IS SO ORDERED.**

Dated: June 26, 2024                             *s/ Pamela A. Barker*
                                                 PAMELA A. BARKER
                                                 UNITED STATES DISTRICT JUDGE